IN THE MATTER OF CLARE R. PETTI, AN APPLICANT FOR
THE ADMISSION TO THE NEW JERSEY BAR.
M–176 SEPTEMBER 1960 TERM.

IN THE MATTER OF DAVID H. ROTHBERG, AN
ATTORNEY-AT-LAW.
D–18 SEPTEMBER 1960 TERM.

Argued June 5, 1961—Decided November 20, 1961.

*Mr. Warren Dixon, Jr.,* argued the cause in the Petti case for Bergen County Committee on Character and Fitness.

*Mr. John E. Selser* argued the cause for Clare R. Petti.

*Mr. Jesse B. Leslie* argued the cause in the Rothberg case for Bergen County Committee on Character and Fitness acting specially as Ethics and Grievance Committee.

*Mr. John E. Toolan* argued the cause for David H. Rothberg (*Messrs. Toolan, Haney & Romond,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J. Clare R. Petti, a candidate for admission to the bar of this state, questions the Bergen County Character and Fitness Committee's refusal to grant her a Certificate of Qualification to take a bar examination. Her former

preceptor, David H. Rothberg, has been made subject to disciplinary proceedings for his part in the events upon which the Committee based its refusal.

Prior to April 1, 1958, Miss Petti became a member of the bar of New York. She was also a New Jersey Certified Public Accountant. On or about April 8, 1958 she began a clerkship under Mr. Rothberg at his Hackensack office. Appropriate papers for the commencement of the clerkship were prepared and filed.

Prior to Miss Petti's clerkship, Mr. Rothberg's only office had been in Plainfield and it remained his main office during her clerkship. Mr. Rothberg opened the Hackensack office when Miss Petti's clerkship began and closed it when she left to clerk elsewhere about a year later. His Hackensack office was a room he sublet from Miss Petti's accounting firm, Eberhart & Petti, at 214 Main Street, Hackensack.

Miss Petti applied for permission to take the bar examinations of February 5 and 6, 1959. The Committee, after examining the qualifications of the candidate, ruled on January 26, 1959 that the clerkship was not in accordance with the provisions of the rules of this court and refused to approve it. The Committee's objections were based upon the inadequate supervision which, it felt, she had received from her preceptor. It stated that Mr. Rothberg was present in the Hackensack office only two days a week and so Miss Petti had no direct supervision for 60% of the time she worked in the office. The Committee refused to certify her but it did not feel that it was necessary for her to serve a full nine months of clerkship. Rather, it recommended that she clerk under proper supervision from that date until the June 1959 bar examinations. The candidate obtained an order of this court to take the examination. She was given permission on terms, took the examination and was unsuccessful.

She thereafter applied for leave to take the bar examinations to be held on June 10 and 11, 1959. The Committee

again undertook to examine the candidate concerning the facts and circumstances of her clerkship but she subsequently withdrew her application.

Meanwhile, the committee examined her under oath on May 28, 1959. Mr. Rothberg was examined under oath on July 16, 1959 and the candidate was re-examined on September 29, 1959. The Committee on October 15, 1959, reported to this court, gave a conditional certification and also stated:

"The testimony taken in this case indicates that there was fee splitting between Miss Petti and her preceptor; that such fee splitting was probably grounded in the fact that Miss Petti was a New York attorney; that she and her preceptor denied the payments to her were fee splitting, but were compensation to her for services rendered as a clerk, although no Social Security or withholding deductions were ever made therefrom; that our Committee is uncertain whether the concealment and denial of what the Committee finds to be the true basis of the financial relationship between Miss Petti and her preceptor would justify it in refusing certification on the ground of character."

Upon being advised that Miss Petti had applied to take the bar examinations on February 25 and 26, 1960, the Committee applied to the court for instructions, based on the report and transcript it had previously filed. The court instructed the Committee to make specific findings, based upon its investigation. The Committee unanimously found and reported on February 10, 1960 that "Miss Petti does not possess the requisite character to be admitted as an attorney in this State and we therefore find adversely to her application." She was notified of this adverse finding.

She then applied to this court, which permitted her to take the examination upon condition that her mark not be disclosed until such time as the court passed upon the question of her fitness. The court also directed that Miss Petti and the Committee submit briefs, covering her questioned clerkship as well as her character and fitness.

As a result of said briefs, we remanded, by order dated May 16, 1960, the matter to the Bergen County Committee on Character and Fitness "with directions to take further

testimony from David Rothberg, Esq., and the applicant Petti with respect to whether Miss Petti was practicing law." We further provided that "The Committee is hereby constituted an ethics and grievance committee for the purpose of considering whether the said David Rothberg, Esq., permitted Miss Petti to practice law in his name or under the guise of a false (as distinguished from a merely inadequate) clerkship."

Mr. Rothberg became subject to disciplinary proceedings because of the question of a *bona fide* nature of Miss Petti's clerkship. In addition, he allegedly aided Miss Petti to practice law though she was not a member of the New Jersey bar, concealed and lied about his business relationship with her, and mingled his own and his client's funds and paid his own expenses from the total.

## I.

### ADEQUACY OF CLERKSHIP.

The Committee found her clerkship insufficient. Mr. Rothberg has had an office in Plainfield since 1948 or 1949. He was introduced to Miss Petti in 1955 or 1956. In the course of talking with her, she told him that she wanted to become a New Jersey attorney and complained that because she was a woman, she could not seem to get a law clerkship in Hackensack or thereabouts. He said he always liked the area and felt that perhaps he could do well up there. He did not recall whether it was her or his suggestion to rent one of the three rooms she and her accounting firm occupied, start a law office in Hackensack, and have her clerk for him until she passed the bar.

An oral renting arrangement was established involving the middle room and monthly payments of $50 were made sporadically. The Hackensack office had no door opening into the hall. It was necessary to enter the suite through one of the other two rooms and then cross that room to enter Mr. Rothberg's office. He hired part-time stenographic

help and an answering service received the phone calls. Clearly, the facilities were inadequate. He asserted that it was understood that he was just trying to see if it would be worth his while to maintain the Hackensack office and therefore wanted to go on an individual basis without any connection with his Plainfield office. He wanted something which could grow and if it did grow he would be very happy; if it did not grow, he had nothing to lose.

The bulk of the preceptor's practice was in Plainfield although he did testify that he averaged between two and two and one-half days a week in Hackensack. Miss Petti stated that primarily she had been in Hackensack, that she spent 60% to 70% of her time in the Hackensack office and the remainder in the Plainfield office. When Mr. Rothberg was too busy, it was requested that she go to his Plainfield office. The supervision, of necessity, was slight.

In summary, her activities were as follows: She testified that when he was not in Hackensack, he would give her specific instructions on what she was to do for him. If she had research to do, she would draft a memorandum or tell him about it orally.

If he had a matter in Bergen County Court such as a pretrial or actual trial or if he had a closing, they would go together. She helped prepare some papers with Mr. Rothberg. She sat in on several pretrials with him. She sat up at the counsel table when they were picking a jury and gave him any information he might require. She also answered the calendar call on her own. At times she would go down to Plainfield and work under his close supervision. When clients came into the Hackensack office and Mr. Rothberg was not there, she would try to take the information and arrange an appointment.

She said that her court appearances consisted of attendance in the Superior Court, both Law and Chancery Divisions, County Court and County District Court—all in Hackensack. She also attended the federal courts in Newark and in Trenton.

Her library facilities in Hackensack for research were meager. She would have to borrow the needed books from other law offices or from the Plainfield office if they were available.

■ The purpose of a clerkship is to help the candidate to obtain experience in the practice of the law so that the public is assured that an attorney has received at least nine months of supervised preliminary experience before he begins his own practice. Generally R. R. 1:19–1 to 4 and R. R. 1:20–1 to 8 set forth the procedures and requirements for admission to the practice of the law. R. R. 1:20–6, entitled "Committees on Character and Fitness," sets forth the duties and powers of this very important body which performs a most valuable function, not only on behalf of the public but also on behalf of the courts. It is the duty of this Committee to investigate the clerkship and the character and fitness of all candidates for admission to the bar, resident in their county. The Committee may require of the applicant information and sources from which it may base conclusions concerning the adequacy of the clerkship and the clerk's character and fitness for the practice of law.

■ R. R. 1:20–7, entitled "Clerkship; Preceptors" sets forth not only the requirements for the clerk but also the duties to be performed by preceptors. The preceptor has the responsibility to see that the clerk attends the courts as well as other divisions of government, such as the Legislature, the office of the sheriff, surrogate and county clerk. Also the preceptor is required to see to it that the clerk maintains a full daily diary setting forth, in detail, a complete log of his activities as a law clerk on each business day of the clerkship. A "complete log" includes the time spent at the office and on each assignment and a brief summary of the work performed. This rule in subsection (g) expressly provides that the diary shall include a record of the days and hours spent in attendance at the courts and agencies and the names of the judges or officials presiding. One of the purposes of such detailed recording is to provide assur-

ance that the clerk is performing the work which gives him experience in the practice of the law.

The clerkship diaries kept by Miss Petti and supervised by her preceptor are a far cry from the fulfillment of these requirements. We agree as stated by a Committee member that the diaries are "skimpy" and we agree with the Committee that the clerkship was inadequate. In addition to the many noncompliances with the rules, we note that "absentee" preceptors necessarily tend to produce such bad results.

We find it unnecessary in the first case of its kind before us to evaluate the blame for this inadequate clerkship. However, the Committee was justified in ruling on January 26, 1959 that Miss Petti's clerkship was not in accordance with the rules.

On June 11, 1959 Miss Petti changed preceptors and clerked in another office from that date up to September 18, 1959. No question has been raised by the Committee with reference to that clerkship.

## II.

### Fee Splitting and Unauthorized Practice of Law.

The preceptor and clerk both claim that there was no set agreement or arrangement for payment of compensation to the clerk. Miss Petti testified that although her compensation averaged about $65 per week, there was no fixed amount in advance. Mr. Rothberg stated that they discussed compensation but he told her he could not promise her any set amount, that he would be as liberal with her as he could and that because of her status as a "professional woman," i. e., as a New York lawyer and a New Jersey accountant, he hoped to pay her as much as $100 per week.

The record shows that the preceptor paid the clerk the following compensation: August 4, 1958, $250; September 18, 1958, $1,200; November 13, 1958, $300; December 25, 1958, $650; March 24, 1959, $480 (plus $3 for stamps); May 1, 1959, $1,000. These payments totalled

$3,880. Thus from April 8, 1958 to May 1, 1959, approximately 56 weeks, the applicant received an average of $69 plus per week compensation.

An analysis of the office records shows that these amounts were one-half of the total fees paid in three matters which were brought into the office by Miss Petti. However, Mr. Rothberg denied that her compensation was to be paid only out of these matters. He said that he limited her compensation to monies in the Hackensack office account, that if and when any money came in, she would be paid a fair compensation. He emphatically stated that whether the source of the fees was from matters she brought in or not was immaterial. She corroborated his general testimony along these lines.

The testimony indicates that Miss Petti and Mr. Rothberg treated the Hackensack income more like partnership income than personal services income. They never provided for withholding and social security taxes because they said it never occurred to them. They insisted that these payments were "wages" but when asked why she had not reported the income as "wages" on the Federal tax form, she replied that if reported as wages, withholding was required, and since nothing was withheld from her wages, wages would be an inappropriate category. These explanations are startling in view of her concession that she knew the employment should determine how income was classified. Her obvious knowledge is fortified by the fact that she had worked for the Internal Revenue Service for five years, and as a Certified Public Accountant had been primarily interested in tax work. She also suggested oversight as the basis of her failure to pay these deductions on her wages.

It is this part of the proceedings that disturbs us. We are compelled to conclude that there was some form of fee-splitting arrangement between preceptor and clerk.

*Canon* 34 provides: "No division of fees for legal services is proper, except with another lawyer based upon a division of service or responsibility." Although we have had no

occasion to interpret this canon, the opinions of the American Bar Association emphasize the basic holding that a lawyer may not split fees with a layman. *American Bar Association —Opinions of the Committee on Professional Ethics and Grievances, pp.* 31–33 (1957).

Mr. Rothberg is correct in his contention that *R. R.* 1:12–8A(b) states in part that "The preceptor or the firm with which the preceptor is associated may share fees with a law clerk * * *." However, that subsection starts out by referring to "A duly registered law clerk, who has passed the bar examination and has been sworn and issued a certificate of limited admission as an attorney-at-law of the State * * *." We intended to permit no division of fees except between a clerk in that category and his preceptor or his preceptor's firm.

█ We think the arrangement was one of fee-splitting which is not proper between preceptor and clerk except insofar as it is sanctioned by *R. R.* 1:12–8A(b). We have not had occasion to speak on the subject up to this time. For that reason we shall refrain from taking any disciplinary action.

█ We are not satisfied, however, that the arrangement contemplated that Miss Petti would practice law in his name. Rather we are persuaded the parties contemplated a clerkship arrangement. Albeit it was, in our view, inadequate to satisfy the requirements of the rules.

The remaining question is whether the respondents failed to disclose the facts with the candor required of an applicant and of a member of the bar acting as a proctor.

As to Miss Petti we are satisfied she fell short of the required standard. We refer, for example, to her initial testimony concerning her lack of knowledge of the fee arrangement between Mr. Rothberg and a client she introduced to Mr. Rothberg. There would be no point in an expansive discussion of the testimony. She has already been much delayed in her quest for membership at the bar. We think it appropriate to order that she shall not be permitted to

156

reapply to the Committee until the opening of 1963 for approval to take the bar examination scheduled for July of that year.

As to Mr. Rothberg, the situation is troublesome. The Committee found that he was "guilty of concealment, evasion and false swearing" before it. Mr. Rothberg protests he was never confronted with the charge, furnished specifications, or permitted a hearing with respect to it. The finding is based upon Mr. Rothberg's testimony in the present matter, rather than testimony given in some other proceeding. We frankly feel, on the present record, that Mr. Rothberg was less than cooperative and candid but in the absence of a hearing addressed to that subject, we could not enter a judgment to that effect. This matter has been protracted, and although the protraction is attributable to respondents alone, yet we feel that the proceedings themselves have had inevitable disciplinary impact and, under all the circumstances, further proceedings would not be warranted.

### III.

#### COMMINGLING OF FUNDS.

The Committee charges Mr. Rothberg with violations of part of *Canon* 11 which reads:

> "Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

No charge of misappropriations is made.

Mr. Rothberg admits that he did not keep a trustee account in Hackensack and that he deposited clients' moneys and fees payable to him in those transactions in a bank account upon which he drew to pay expenses for that office. His explanation is that he regarded all monies deposited in that account as belonging to his clients and that he first distributed the monies to his clients' uses before he drew upon

the account for his private purposes. Thus, he claims, his clients were not harmed.

As we stated *In re White,* 24 *N. J.* 521, 525 (1957) "although respondent's infractions of the [same] canon did not involve overreaching of a client or other additional impropriety, nonetheless the naked violations themselves require that she be reprimanded." We similarly hold and an order to that effect will be entered.

HALL, J. (dissenting). In my view, these matters are of much more serious import than the majority opinion indicates and consequently I feel compelled to disagree with its conclusions in considerable measure. To make clear what concerns me, the proceedings and evidence must be reviewed as a whole and in the light of chronological development before the Committee.

Miss Petti's so-called clerkship with Mr. Rothberg commenced on April 8, 1958, contemporaneously with the opening of his part-time Hackensack branch office in a subleased room in the suite occupied by the accounting partnership of which she had been a member for a number of years. After completing law school in Brooklyn in 1954, she had been admitted to the New York bar in December 1956 while a resident of that state, but according to her testimony, never practiced law. Her residence in New Jersey commenced (or more accurately was resumed, since it appears she had been a resident of this state at a previous time) in March 1957.

In 1958 our rules required the 9 months clerkship to be served before the bar examination. From the standpoint of time, Miss Petti first became eligible to take an examination in February 1959. Shortly prior thereto, the Committee, upon interview and investigation pursuant to then *R. R.* 1:20–6(c), reached the conclusion that her clerkship could not be approved by reason of lack of adequate preceptorial supervision and so reported to this court. In addition, as appears from the majority opinion, the entire office setup

158

was quite insufficient for a proper clerkship. The question of the applicant's character and fitness was apparently not then of concern, for the Committee suggested that she clerk under proper conditions until the next examination in June. She applied to this court, however, for leave to sit for the February examination and permission was granted. (At that time the rules specified the committee's certificate of good moral character, fitness for the practice of law and satisfactory service of the clerkship to be a prerequisite to admission after passage of the examination. Now, the certification of character and fitness is a condition precedent to the taking of the examination. R. R. 1:20–6(a). And, of course, the rules have also been changed to permit the clerkship to be served after the passage of the examination during a period of limited admission.)

Miss Petti failed the February examination and filed notice of intention to take the one to be given in June. The Committee, desiring to inquire as to her clerkship in the interim and recognizing the necessity of a formal hearing in the event its prior informal conclusion was to be reviewed by this court, scheduled such a hearing, which consisted of three sessions commencing on May 28, 1959. It developed that Miss Petti had not followed the Committee's suggestion and that the clerkship with Mr. Rothberg had continued as previously until a few days before the hearing. The Committee sought to explore and record the situation fully by examination of Miss Petti and her preceptor. The inquiry covered not only the matters of physical adequacy and supervision, but also properly led into exploration of financial and business aspects of the Hackensack office.

The Committee, dependent entirely on the testimony of preceptor and clerk, had very considerable difficulty in its interrogation, particularly as to the latter aspects. Answers were unresponsive, evasive or seemingly incredible on their face. It was obvious the true picture was being concealed in many particulars. In fact the preceptor refused to answer certain queries at all. While the testimony was more nega-

tive than positive, it was reasonably apparent the situation went beyond a merely inadequate clerkship, causing the report to this court in October 1959, quoted in the majority opinion, which presented the matter of fee-splitting between preceptor and clerk, and posed the question of justification to refuse a character certificate by reason of the applicant's "concealment and denial" in her testimony.

Since no application to take an examination was then pending, further action was not required until the matter came before the Committee again when Miss Petti filed a notice of intention to take the February 1960 examination. At that time it made a definite finding, without further specification, that the applicant did not possess the requisite character to be admitted as an attorney. She petitioned this court for a hearing, *i. e.*, an appeal from the Committee conclusion. We directed the filing of briefs. Our study of the transcripts and the briefs convinced us the situation had not been fully disclosed by clerk and preceptor and indicated the need for a more searching inquiry.

Our order of May 15, 1960 followed, remanding the matter to the Committee to take further testimony from both and to consider whether the clerk "was practicing law" and whether the preceptor permitted such to be done "in his name or under the guise of a false (as distinguished from a merely inadequate) clerkship"—the broadest possibility that we could envision. In view of the difficulties the Committee had previously encountered in its examination, we also directed that both "shall testify in full with respect to the origin of the business, the fiscal affairs of each, and shall produce for the Committee's examination all of the records relating to the said matters, including bank records" and authorized the examination of the several clients involved "with respect to whether the business was acquired by Miss Petti or Mr. Rothberg."

The Committee's further inquiry resulted in a report to this court which concluded, after making detailed factual findings: "It is an inescapable conclusion that they agreed

to share the fees of the Hackensack office on a 50–50 basis"; "the 'clerkship' was a sham"; "both 'preceptor' and 'clerk' were guilty of concealment, evasion and false swearing before the Committee"; and the office bank account "contained an improper mixture of attorney's and clients' funds."

We issued an order to Mr. Rothberg to show cause why he should not be disciplined on the basis of these conclusions, which came on to be heard along with Miss Petti's appeal from the Committee's refusal to issue her a character and fitness certificate. The basis of the latter had been greatly augmented, of course, by the findings and conclusions just referred to.

It is clear that the Committee's original conclusion of mere inadequacy of the clerkship, discussed at some length in the majority opinion, is not in issue here. Miss Petti's briefs do not challenge it and her counsel did not raise the point at oral argument. Rather it appears from the record that both she and Mr. Rothberg accepted the Committee's determination after the initial session of the first hearing and she served with another preceptor for four or five months commencing in June 1959. As the majority says, there can be no question that the Rothberg clerkship did not meet what might be called the mechanical or physical standards of the rules. That phase is, therefore, of importance now only as it bears on the more important matters presented by the Committee's final report. It should also be stated that I do not disagree with the majority treatment of the infraction relating to the bank account nor would I quarrel with its disposition of the matter of division of fees between preceptor and clerk here if this were a *bona fide* clerkship relation and nothing else were involved.

Before discussing the evidence, one bit of background, adverted to at oral argument, should be mentioned. In early January 1958, just three months before the Rothberg clerkship began, Miss Petti petitioned this court for waiver of the clerkship requirement. In her moving papers, she recited her admission to the New York bar in December 1956

and her residence in New Jersey since March 1957. She stated that she was not a young person and was "completely dependent on her own support. A clerkship for a period of nine months would create such a hardship financially and economically, that it would be otherwise impossible for her to take the examination in accordance with the rules." The application was, of course, denied, but it cannot be overlooked in considering the true nature of the relationship here.

The posture of the evidence when the Committee made its October 1959 report may first be noted. Miss Petti testified that she had been unable to obtain a clerkship in any law office in the Hackensack area because of her sex. She did not otherwise speak of the circumstances which led to the establishment of Mr. Rothberg's branch office and her connection with it. His testimony was to the effect that, in the course of business and social associations, she had told him of this inability, that he had always liked the area and that he decided to rent a room from her, open a branch office on a trial basis and allow her to clerk with him.

In her testimony about financial arrangements she spoke of having brought three matters to the office. One involved the collection of several accounts for a business man, the second was essentially a matrimonial case, and the third was referred to as the Hackett matter, to be mentioned more fully later. The impression sought to be created was that these were only three of a considerable number of matters which came to Mr. Rothberg at this office and that they arose and the clients were introduced to him by her in natural course some time after the office had been established.

The Committee's suspicions were obviously aroused by Miss Petti's story that the six payments totalling $3,880 which she received, in large and varying amounts and at irregular intervals during the clerkship (as detailed in the majority opinion), represented wages and by the fact that they were not so treated for tax purposes. Her contention was, as was his, that, while it was contemplated she would receive compensation, no fixed sum was agreed upon in

advance and the only understanding was that she would be paid to such extent as the business at this branch warranted, as funds were available therefrom and as he thought she was worth. Both denied there was any express or tacit arrangement for her to participate in fees received in the matters she brought to the office. The upshot of her very evasive testimony was a claim that she did not know the basis on which the sums were paid to her, that she had no knowledge of her preceptor's financial situation, and that none of the payments had any direct relation to any matter in the office, although the two largest ones were made about the time of receipt of payments on account of the fee in the Hackett matter. She specifically stated that she did not know the amount of the fee in that case.

When Mr. Rothberg was examined, he was asked to testify about the payments from his check book and any notations concerning the same. He was hostile and uncooperative, obviously failing to recognize his elementary obligation as an officer of this court to one of its committees. He at first refused to produce the book, then would produce only the six cancelled checks, and finally did purport to read, in part, notations from the check stubs without permitting the committee to examine them. He at first sought to give the impression that the payments were not related to any particular matter and denied throughout that they represented any percentage of fees received or had any direct relation thereto. When pressed, he finally admitted the stub of each check bore the name of a case and, after considerable backing and filling, said that three were noted as Hackett (or Yanow, Hackett's accountant) and a fourth as one of the other cases Miss Petti had brought in plus another which did not originate with her. He told the Committee the notations on the other two stubs did not relate to matters with which she was connected. His claim was that the notations were in relation to some personal cost accounting system. He refused to disclose the fees he received in any of the cases, but did finally concede, rather equivocally, that whenever he drew

a check to Miss Petti, he usually drew one to himself in about the same amount. It was clear that she received no other payments during the 13 months of the clerkship beyond the six checks mentioned.

Pursuant to the directions of our order of May 1960, the Committee held another hearing, also in three sessions. With the office check book available for Committee inspection, Mr. Rothberg and Miss Petti testified again at the first session about the financial and general business aspects of the office. The picture that emerged was quite different from that which they had obviously sought to portray at the original hearing, and the concealments, half-truths and outright fabrications in the earlier testimony became apparent.

They admitted that the only matters handled and fees received by the Hackensack office were the three cases which Miss Petti brought in plus a few other minor matters (specified at the oral argument as three in number). The office had been closed and the rental terminated shortly after Miss Petti entered upon the other clerkship in June 1959, although Mr. Rothberg's name was left on the door because of the pendency of these proceedings. The check book disclosed equal payments to Mr. Rothberg at the time of each of the six checks to Miss Petti. The stubs all bore notations of a particular case, and in all except one, the matters so referred to were the ones brought to the office by Miss Petti. Almost all of the checks were in her handwriting and signed by her under a power of attorney she held for the account. It was admitted that the equal payments were not a coincidence and that all fees received by the office were evenly divided except that the balance in the account when the office was closed was withdrawn entirely by Mr. Rothberg. He conceded, in view also of the failure to withhold income tax or pay social security taxes on the sums paid to Miss Petti and his own failure to show the payments to her or the general expenses of the office in his personal income tax return, that the operation worked out in effect as a partnership. Both still claimed, however, that the equal division of fees had not

been agreed upon in advance and Miss Petti again testified that she did not know the amount of the fee in the Hackett matter.

The Committee then proceeded at two later sessions to examine the clients whose matters Miss Petti had brought to the office.

The business man, the collection of whose accounts comprised one matter, had been an accounting client of Miss Petti for some years. In December 1957, one of his salesmen embezzled a substantial sum of money and absconded, resulting in confusion as to the amounts owed him by his customers. She was asked to deal with the customers, reconcile the balances and collect the amounts found to be due. She was unsuccessful in a number of cases and suits were required. She recommended Mr. Rothberg who handled the cases in court. (Her diary indicates the suits were commenced about the middle of May 1958.) The fee payments to him were for the litigation work only.

The client involved in the matrimonial matter was a customer of the business man just mentioned who first met Miss Petti in that connection in early 1958. He then hired her to do his business accounting work. About the same time he was involved in marital difficulties and consulted her on several occasions about them and the handling of his business affairs because of them. He met Mr. Rothberg for the first time when his wife thereafter instituted a suit and Rothberg represented him at the trial of the contested litigation.

The Hackett matter is the most important and revealed a situation the possibility of which we had not even imagined. Mr. Hackett is a prominent figure in the entertainment world. Through his testimony and that of his New York accountant, Mr. Yanow, the following facts appeared. He wished to acquire for his own home a large residence property in Fort Lee which had been owned by a recently murdered underworld figure. The property was subject to mortgages totalling about $38,000 and to federal and state tax liens.

Title had apparently devolved upon the owner's widow who lived in Canada. Mr. Hackett sought the assistance of a lawyer friend in New York and of Mr. Yanow. As a result Miss Petti was engaged by Yanow in January 1958 (after she had petitioned this court for waiver of the clerkship requirement) to acquire the property by whatever means possible,—*i. e.,* by deed from the widow and satisfaction of the encumbrances thereafter or by purchase of the mortgages, foreclosure and subsequent payment or acquisition of the tax liens. The arrangement was that Mr. Hackett, through Mr. Yanow, would pay her the sum of $60,000, in installments as needed, to acquire the property, out of which she was to satisfy all encumbrances and pay all expenses and costs of acquisition. Any balance remaining was to be hers as a fee for her services. It was known to Mr. Yanow that she was a New York attorney and a New Jersey accountant who had formerly been with the Internal Revenue Service. She was selected because of the latter connection in view of the need to dispose of the federal liens. It was left entirely to her to engage and pay a New Jersey attorney out of the package figure if the services of one proved necessary. Unless a mortgage foreclosure turned out to be required, the services contemplated were not strictly legal in nature, but could legitimately be performed by a layman in the capacity of a broadly empowered agent.

By the end of March it became apparent that Miss Petti could not acquire the property by deed. In that month Mr. Yanow purchased the mortgages in his name, paying slightly over $38,000 for them out of the $60,000 and instructed her to arrange to prosecute a foreclosure to obtain title by that method. Shortly thereafter and before the Hackensack office was opened, Mr. Hackett and Mr. Yanow met Mr. Rothberg for the first and only time. Both said they were unconcerned with his role in the matter. Mr. Hackett considered Miss Petti his lawyer and Mr. Yanow had left the matter entirely in her hands.

The $22,000 balance of the $60,000 package was paid by Mr. Yanow to Miss Petti in a series of 15 checks to her order. All were dated within the period of the clerkship except the first one for $150 given on March 4, 1958 prior to the opening of the Hackensack office and the last dated August 4, 1958, about three months after its termination, which bore the notation "Balance of fees." Inspection of the cancelled checks produced by Mr. Yanow disclosed that checks totalling $10,000 were endorsed by her and deposited directly in Mr. Rothberg's office account. The balance went into her personal account. (Her later testimony established that $3,200 of the deposits in the personal account was subsequently transferred to the Rothberg office account.)

After Mr. Yanow's testimony, Miss Petti resumed the stand and admitted the truth of everything he had said. Furthermore, and of great importance, she testified that she agreed with Mr. Rothberg, in advance of the opening of the branch office, to pay him a fee of $7,500 to foreclose the mortgages, that he actually received $7,000 of that sum, which she herself paid him out of the moneys originally deposited in or transferred to his business account, and that this sum was divided equally between them by inclusion in the six payments to her previously alluded to. She further said that during the period of the clerkship, she paid some costs and expenses of the property acquisition from her personal account out of the moneys she had directly deposited there. The remainder of the expenses, including satisfaction of the tax liens, came from the monies originally deposited directly in the Rothberg account. Her "package deal" profit out of the $60,000 total, beside her portion of the split of Mr. Rothberg's fee, amounted to something near $9,000 which was represented by the balance ultimately remaining of the monies originally deposited in her personal account. She claimed that the services which this sum represented were only those rendered in the three months prior to the clerkship in her efforts during that period to attempt to acquire the property. (Note the requirement of

*R. R.* 1:20–7(d) that during the clerkship the clerk shall not engage in or pursue "any business, occupation or employment incompatible with the full, fair and *bona fide* service of such clerkship.") She further testified that she did not tell him and he did not know of her profit in the package transaction. When Mr. Rothberg took the stand again as the last witness before the Committee, he did not dispute any of the prior testimony about the Hackett matter arrangements.

Three pieces of testimony near the end of the hearing stand out as particularly revealing. Miss Petti was asked: "In other words, this transaction boiled down to your retaining Mr. Rothberg to foreclose the mortgage?" She answered: "I would say yes." She was in fact the principal. Mr. Rothberg testified that when Miss Petti first approached him about a clerkship she told him of the required foreclosure and he fixed the fee then. As he put it: "Frankly, this is one of the reasons the clerkship opened and the fact that I came up to Bergen County." Finally, when she was asked why she had not disclosed the whole situation when she was originally queried by the Committee, her reply was, in effect, that she did not think the Committee "could look into a transaction of this kind."

My greatest concern is with the *bona fides* of this clerkship and of the parties in the light of the whole situation as finally disclosed, quite apart, for the moment, from the matter of evasion, concealment and fabrication in the course of the inquiry. The Committee called the clerkship "a sham." The thought intended to be conveyed by this characterization in view of the preceding findings in the report (which substantially conform to the facts set forth above) obviously was that the parties sought to palm off as a clerkship something which clearly and knowingly was not. The attempt was to create the form, evade the substance and by this subterfuge qualify Miss Petti for the examination.

Having in mind her prior application to waive the clerkship for economic reasons, we find her suddenly with work arising

out of her accounting practice which requires litigation and the services of a New Jersey attorney. No other conclusion is reasonable but that she utilized this opportunity to solicit and make a bargain with Mr. Rothberg. He was to receive her litigation business for a fee fixed in advance in return for his opening a part-time office as her tenant from which she could register a clerkship. At the very least, this was essentially a preceptor-clerk relationship bought and paid for by the clerk, which, even if the ensuing clerkship were completely in conformity with the letter and spirit of the rules, this court should never countenance and which should alone call for discipline of both preceptor and clerk. But there is much more here. The office set-up was completely insufficient and at best supervision was most minimal. Both of these factors assume significance beyond mere inadequacy when viewed with all the other facts and circumstances. The office was closed when Miss Petti obtained a clerkship with another attorney. During the 13 months the office was maintained the principal business comprised the matters of the three clients introduced by Miss Petti. The operation was handled as a partnership with even division of fees. The story that this division was not agreed upon in advance is incredible in itself, and cannot be believed (*In re Perrone's Estate*, 5 N. J. 514, 522 (1950)), a conclusion with which I take it the majority agrees.

Moreover, there is ample evidence to substantiate the Committee's finding "that the so-called clerkship was agreed upon as a method by which Miss Petti could do all the work except the signing of pleadings and legal papers and actual court appearances, and as a means whereby Miss Petti could receive a share of the fee." Much of the testimony itself supports the inference that Mr. Rothberg did not enter into a matter to any extent until it was ready for the filing of pleadings or court appearances. And the diary, while inartistic and skimpy, is revealing. References to Mr. Rothberg are few and far between. The entries, especially up until the time in January 1959 when the Committee disapproved the

clerkship as inadequate, are, for the most part, much more indicative of a person conducting his own office and business than of a law clerk. Most of them, of course, relate to the matters of Miss Petti's three clients. In the Hackett matter, many refer to the acquisition, possession and care of the property which are essentially non-legal, and would arise under Miss Petti's overall employment rather than in connection with the foreclosure (which, by the way, was uncontested). Other names and matters that appear, which of course never materialized into fees as far as the law office was concerned, seem as much if not more related to accountancy practice. One is greatly inclined to doubt that Mr. Rothberg was at Hackensack or she at his Plainfield office anywhere near as much as their general testimony at the first Committee sessions sought to make it appear.

The suggestion is advanced that this was nonetheless a *bona fide* clerkship because he took her to court with him on cases in his main office and that she did some legal research on matters arising there. The diary does not clearly support much of such activity and one has to conclude it was not extensive. In any event, I fail to see how it could cure the basic infection.

In summary, looking at the situation as a whole, I cannot comprehend how it can be concluded that the relationship here came even close to that of a *bona fide* clerkship. To me the evidence is clear and convincing that it basically constituted a contrivance, deliberately arranged and carried through by both parties with the intent of hoodwinking the Committee and evading the requirements of this court. The Committee's conclusion to that effect should be adopted. Obviously I cannot agree with the majority in its view that nothing of serious impropriety took place and in its exculpation of the participants.

The other phase of these matters relates to the Committee's conclusion that both parties "were guilty of concealment, evasion and false swearing" before it. On the face of the present record the correctness of the conclusion is patent.

The majority appears to agree. Our differences relate to the disposition to be made.

As far as Miss Petti is concerned, we are dealing with character and fitness to become a member of the bar. Our responsibility, for the fulfillment of which we must of necessity rely on the committees in each county, is to be as certain as possible that all candidates for admission possess those essential traits of character which warrant their being entrusted with the legal business of the public and bespeak their future devotion to the ethics of the profession and exemplary conduct as officers of the court. Integrity and moral stamina are the most elemental of these characteristics. See *In re Hyra,* 15 *N. J.* 252 (1954). The burden is upon the applicant to establish fitness before the committee (as distinct from the case where charges are made against an admitted attorney when the *onus* of proving the charges rests on the committee). Lack of fitness seems apparent when the prospective lawyer deceives and lies to the character committee in matters of substance and has also sought purposefully to evade the clerkship requirement by subterfuge. In my opinion the conclusion of this Committee that Miss Petti should not be granted a certificate of character and fitness is eminently justified and should be affirmed. Mere postponement of the right to take the examination as a penalty is not, to my mind, appropriate in the face of this record. This is a very unpleasant conclusion to have to reach and I am sure it was equally so for the Committee, but, as in all disciplinary cases, the responsibility of this court and its committees to maintain and strengthen the standards of the profession can only be fulfilled, with that fundamental purpose in mind, by passing upon each situation as our individual consciences dictate, no matter how distasteful it may be.

Nor do I think that Mr. Rothberg should be exonerated for his conduct before the Committee on the basis the majority decides. This is not a case where, on the complaint of a client against his lawyer, the latter tells one story as to what occurred, the client tells another and an

ethics committee believes the client. On the present record, the deception and fabrication were unmasked and, for all practical purposes, admitted after further inquiry in the same proceeding. There is no problem of deciding as to credibility between conflicting witnesses. It should be elementary that preceptor as well as clerk owes the obligation of full and truthful disclosure to a character committee. The preceptor should be even more cognizant of such responsibility than his clerk. Mr. Rothberg objects that he had no notice of the Committee's conclusion in this respect before the filing of its report and no opportunity to be heard with respect to it. That he certainly should have, and the matter is serious enough to warrant taking the time for it. I would therefore remand for such further hearing and the submission of a supplemental report by the Committee, this phase of the matter then to be further considered by this court along with that of appropriate discipline for his participation in the sham clerkship.

No. M–176:

*For deferment until July 1963 examination*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For denial of admission to examination*—Justice HALL—1.

*For remand*—Justice HALL—1.